# Illinois Official Reports

## Supreme Court

---

### *In re Marriage of Heroy*, 2017 IL 120205

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* MARRIAGE OF DONNA TUKE HEROY, n/k/a Donna M. Tuke, Appellant, and DAVID F. HEROY, Appellee. |
| Docket No. | 120205 |
| Filed | March 23, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Moshe Jacobius, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part, reversed in part. Circuit court judgment affirmed. Cause remanded. |
| Counsel on Appeal | Leon I. Finkel, Peter Sullivan, and Myra A. Foutris, of Berger Schatz, of Chicago, for appellant. |
| | Schiller DuCanto & Fleck LLP, of Chicago (Michele M. Jochner, Tanya J. Stanish, and Karen M. Schetz, of counsel), for appellee. |
| Justices | JUSTICE GARMAN delivered the judgment of the court, with opinion. |
| | Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Burke, and Theis concurred in the judgment and opinion. |

¶ 1 David Heroy filed a petition to modify or terminate his monthly maintenance payment to his former spouse, Donna Tuke. The circuit court granted the award in part, reducing the payment from $35,000 per month to $27,500 per month. Tuke filed a petition for attorney fees, which was granted in part. Heroy appealed both judgments. Tuke filed a petition for prospective attorney fees to defend against the appeal, which was also granted in part. Heroy appealed, and the appeals were consolidated. The appellate court reversed the awards for attorney fees and modified the maintenance award after finding the circuit court had committed a calculation error. Tuke appealed to this court, pursuant to Illinois Supreme Court Rule 315 (eff. Mar. 15, 2016), and Heroy requested cross-relief, pursuant to Illinois Supreme Court Rule 318 (eff. Feb. 1, 1994).

¶ 2 BACKGROUND

¶ 3 Donna Tuke and David Heroy were married in 1980. By an order of the circuit court of Cook County, their marriage was dissolved in 2006. As part of the dissolution order, the court ordered Heroy to pay to Tuke $35,000 per month in permanent maintenance. The court based the award on its finding that the couple had enjoyed a lavish standard of living while married and that Tuke could not reasonably be expected to be able to maintain that lifestyle on her own. The court did find, however, that Tuke could reasonably be expected to earn $40,000 to $50,000 per year, based on her prior experience as a law librarian and publisher of a law bulletin. The dissolution order instructed both parties to pay their own attorney fees. The circuit court denied Heroy's petition for reconsideration, the appellate court affirmed the judgment (*In re Marriage of Heroy*, 385 Ill. App. 3d 640 (2008)), and this court denied Heroy's petition for leave to appeal (*Heroy v. Heroy*, 231 Ill. 2d 632 (2009) (table)).

¶ 4 Less than one year later, Heroy filed a petition to terminate or modify the maintenance award. While this litigation was ongoing, Tuke filed a petition for contribution to her attorney fees. On January 23, 2012, the circuit court issued a memorandum opinion and order in which it concluded that Heroy had proven that his income had decreased, justifying a modification of the maintenance award from $35,000 per month to $27,500 per month. The court found no reason to further reduce the amount based on Heroy's complaint that Tuke had failed to make adequate efforts to support herself.

¶ 5 The court also granted in part Tuke's petition for contribution to her attorney fees. During oral arguments, the court acknowledged a tension between this court's statement in *In re Marriage of Schneider*, 214 Ill. 2d 152 (2005), and section 508 of the Illinois Marriage and Dissolution of Marriage Act (the Act) regarding the standard for awarding attorney fees. In *Schneider*, this court stated that an award of contribution is appropriate when the petitioning party is unable to pay his or her attorney fees and the other party has an ability to do so. *Id.* at 174. On the other hand, section 508 instructs the court to apply a list of factors to determine whether one party should be required to contribute to the attorney fees of the other, including the criteria used to divide marital property and award maintenance. 750 ILCS 5/508 (West 2014). The court noted that it would apply the standard from *Schneider* and, in its written opinion, concluded that Tuke had some ability to pay the fees but that if she were required to pay all of the fees, her financial stability would be undermined. The court also found that

Heroy was able to pay Tuke's fees. The parties stipulated that $345,000 was a reasonable amount for attorney fees related to the petition to modify maintenance. In her petition, Tuke stated that her fees at that point exceeded $1 million. The court instructed Heroy to pay $125,000 of Tuke's attorney fees.

¶ 6 Heroy filed a petition for reconsideration, and after limited oral argument, the court denied the motion and issued a second memorandum opinion and order. In this second opinion, the court reiterated its conclusions that the maintenance payment should not be reduced based on Tuke's efforts at rehabilitation and that Tuke could not pay the entirety of her attorney fees without risking financial instability. Heroy appealed, and Tuke filed a petition seeking $100,000 in prospective attorney fees to defend against the appeal. The circuit court granted the petition in part and ordered Heroy to pay $35,000 in prospective attorney fees. Heroy again appealed.

¶ 7 The appellate court consolidated Heroy's appeals and reversed the judgment of the circuit court in part. 2015 IL App (1st) 130290-U. First, the appellate court considered the propriety of the circuit court's decision to reduce Heroy's maintenance payment. Though the court found no error in the conclusion that the payment should be reduced, it determined that the circuit court made an error when calculating the amount of the modified payment. The court focused on the language used in the conclusion paragraph of the circuit court's second order: "the Court approximates an award of about 25% of David's cash flow." The court noted that $27,500 was closer to 28.5% of Heroy's cash flow and thus determined the maintenance award should be $25,745 per month. The court then concluded that the circuit court had not erred when it declined to reduce the maintenance payment based on Tuke's efforts (or lack thereof) at supporting herself.

¶ 8 Finally, the appellate court reversed the circuit court's awards for attorney fees. In doing so, the court concluded there was no evidence in the record supporting Tuke's claim that she was unable to pay the fees. The court therefore vacated the awards of attorney fees and remanded the case to the circuit court with instructions to enter a maintenance award of $25,745 per month. This court allowed Tuke's petition for leave to appeal, and Heroy requested cross-relief. Ill. S. Ct. R. 315 (eff. Mar. 15, 2016); R. 318 (a) (eff. Feb. 1, 1994).

¶ 9                                              ANALYSIS

¶ 10 Tuke asserts that the appellate court failed to comply with the requirements of section 508 of the Act (750 ILCS 5/508 (West 2014)) when it reversed the circuit court's judgments regarding attorney fees. Tuke also challenges the appellate court's conclusion that the circuit court made a calculation error and asks this court to reinstate the $27,500 per month maintenance award. Alternatively, she contends that the appellate court lacked the authority to modify the award and should have remanded the case to the circuit court to recalculate the amount. Finally, Heroy argues, in his request for cross-relief, that the circuit court should have further reduced his monthly maintenance payment based on Tuke's failure to take adequate steps to support herself. Each of these issues is reviewed in turn.

¶ 11                         *Contribution Toward Tuke's Attorney Fees*

¶ 12 Two awards for attorney fees are at issue before this court. The first was granted by the circuit court for fees already incurred and, at least in part, already paid by Tuke. She filed the

petition after Heroy filed his petition to modify the maintenance award. The second is an award for prospective attorney fees; it was granted after Heroy filed his notice of appeal. Heroy's appeals from both awards have been consolidated.

¶ 13 The circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion. *Schneider*, 214 Ill. 2d at 174; *In re Marriage of Bussey*, 108 Ill. 2d 286, 299 (1985). However, determining whether the circuit court applied the correct standard when it awarded the fees requires interpretation of section 508 of the Act, which is a legal question that the court reviews *de novo*. *In re Marriage of Murphy*, 203 Ill. 2d 212, 219 (2003). When interpreting a statute, "the court must ascertain and give effect to the intent of the legislature." *In re Marriage of King*, 208 Ill. 2d 332, 340 (2003). To do so, the court looks first to the plain language of the statute. *Id.* Where the language is clear and unambiguous, the court applies the statute without resort to further aids of construction. *Id.* Where the language is ambiguous, the court may look to other sources to ascertain the legislature's intent. *Id.*

¶ 14 Section 508 of the Act provides:

"(a) The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. Interim attorney's fees and costs may be awarded from the opposing party, in a pre-judgment dissolution proceeding in accordance with subsection (c-1) of Section 501 and in any other proceeding under this subsection. At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2014).

In turn, subsection 503(j) provides:

"(j) After proofs have closed in the final hearing on all other issues between the parties *** and before judgment is entered, a party's petition for contribution to fees and costs incurred in the proceeding shall be heard and decided, in accordance with the following provisions:

***

(2) Any award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j) (West 2014).

¶ 15 Heroy argues that section 508 should be interpreted to mean that an award for attorney fees is appropriate only when the party seeking the award is entirely unable to pay and the opposing party has the ability to do so. This argument is based on this court's statement in *Schneider* (214 Ill. 2d at 174). In *Schneider*, the court focused primarily on whether personal goodwill and accounts receivable are properly included when valuing a business for the purpose of dividing marital assets. *Id.* at 162, 168. The court also addressed a petition for attorney fees. The court stated that the party seeking attorney fees must "establish her inability to pay and the other spouse's ability to do so." *Id.* at 174. Because the parties did not dispute what standard ought to apply when making such determinations, the court did not discuss the basis for this standard. The "inability to pay" standard had previously been applied in supreme court decisions, including *In re Marriage of Cotton*, 103 Ill. 2d 346, 361 (1984), and *In re Marriage*

- 4 -

*of Bussey*, 108 Ill. 2d 286, 299-300 (1985). Heroy further notes that the relevant language of section 508 ("after considering the financial resources of the parties" 750 ILCS 5/508 (West 2014)) has not been amended over time, despite the court's repeated application of the inability to pay standard, and thus, he contends, there is no reason to deviate from the standard. See *In re Marriage of Mathis*, 2012 IL 113496, ¶ 25 ("We assume not only that the General Assembly acts with full knowledge of previous judicial decisions, but also that its silence on [an] issue in the face of decisions consistent with those previous decisions indicates its acquiescence to them." (citing *People v. Villa*, 2011 IL 110777, ¶ 36 ("[T]he judicial construction of the statute becomes a part of the law, and the legislature is presumed to act with full knowledge of the prevailing case law and the judicial construction of the words in the prior enactment."))). Tuke argues the inability to pay standard conflicts with the requirement in section 508 that the decision to award attorney fees be made in accordance with subsection 503(j).

¶ 16 Several panels of our appellate court have reached different conclusions when considering whether the inability to pay standard, derived from *Cotton*, *Bussey*, and *Schneider*, contradicts the statutory language of section 508. In *In re Marriage of Haken*, the party opposing the award of attorney fees argued that the trial court must find, as a prerequisite, that the party seeking the award was unable to pay. 394 Ill. App. 3d 155, 161 (2009). The court rejected this argument and held that "[s]uch a reading of [section 508] eviscerates the statutory directive in section 503(j)(2) to consider the criteria for the division of marital property under section 503(d) in making contribution awards." *Id.*; see also *In re Marriage of Anderson*, 2015 IL App (3d) 140257, ¶¶ 19-20 (adopting *Haken* and rejecting the inability to pay standard); *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 39 (reaffirming *Haken* principle).

¶ 17 The *Haken* court relied in part on the passage of the Leveling of the Playing Field in Divorce Litigation Amendments (Leveling Amendments) to the Act as evidence that the legislature intended to move away from the general rule that each party pay his or her own attorney fees in divorce proceedings. *Haken*, 394 Ill. App. 3d at 162 (noting that the trial court stated in its decision that "[t]he entire 'inability to pay/ability to pay' mantra has been carried over from prior case law established before the substantial amendments to the attorney[ ] fees provisions of the Dissolution Act over the years, including the 'Leveling the Playing Field' provisions in 1997" (internal quotation marks omitted)). The Leveling Amendments added to section 508 the following provision: "At the conclusion of the case, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503." Pub. Act 89-712 (eff. June 1, 1997). The Leveling Amendments added subsection 503(j) in its entirety. *Id.* The legislative debates regarding the Leveling Amendments indicate that the drafters were concerned that one party could use his or her superior assets to force the other to settle or not contest various issues in dissolution proceedings. 89th Ill. Gen. Assem., Senate Proceedings, Dec. 5, 1996, at 24 (statements of Senator Parker) ("It creates a new summary interim fee system, designed to address the plight of the economically disadvantaged spouse and to eliminate inequality in access of funds being used as a litigation tool."); *id.* at 25-26 ("What we have heard in our hearings is that, very often in the divorce process, you will have one spouse that is empowered because they have a lot of money and the other disadvantaged spouse does not have funds to obtain an attorney and proper representation. What this allows is for the—both spouses to go in to a hearing *** and then there can be fees taken from the assets to be given to the disadvantaged spouse so that they can have proper representation. And that levels the playing field and makes it easier and

simpler for everybody."). The *Haken* court relied on these amendments as evidence that the legislature intended to do away with the inability to pay standard. 394 Ill. App. 3d at 162 ("Some courts have repeated language from older cases to the effect that a party seeking fees must establish his or her inability to pay and the other spouse's ability to do so. [Citations.] They fail to note the language added to section 508(a) in 1996 ***. *** The requirement that a person seeking contribution show an *inability* to pay appears nowhere in the statute." (Emphasis in original.)); see also *Anderson*, 2015 IL App (3d) 140257, ¶ 20 ("We find the analysis offered by [the] *Haken* court persuasive and adopt its rationale. *Haken* incorporates the statutory amendments designed to 'level the playing field' in dissolution proceedings.").

¶ 18       Other panels have rejected the notion that the 1996 amendments did away with the inability to pay standard and interpret the standard as encompassing the statutory factors. In *In re Marriage of Sobieski*, the court concluded that the factors "are the means by which a trial court can determine whether a spouse has an inability to pay." 2013 IL App (2d) 111146, ¶ 49. Similarly, in *In re Marriage of Keip*, the court described section 503(j) as "set[ting] forth the procedures to be followed in presenting and hearing issues of attorney fees in dissolution cases, [and] codif[ying] the standard criteria courts had traditionally applied in determining whether to award attorney fees and in what proportion." 332 Ill. App. 3d 876, 884 (2002). The court then held that the petitioner "did not meet her burden to show that she was unable to pay her attorney fees or that [the respondent] was able to pay." *Id.* See also *In re Marriage of Johnson*, 2016 IL App (5th) 140479, ¶ 112 (citing *Schneider*, 214 Ill. 2d at 174, for the rule that the party seeking contribution must show an inability to pay and section 503 for the rule that the court "must base the award [for contribution to attorney fees] on the criteria for the division of marital property"); *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 113 ("A contribution award is based on the criteria for the division of marital property and where maintenance has been awarded, the criteria for an award of maintenance. *** The spouse seeking the contribution must establish his or her inability to pay and the other spouse's ability to pay."). In *In re Marriage of Shen*, the appellate court addressed the different approaches directly. 2015 IL App (1st) 130733, ¶¶ 99-107. The court rejected the analysis in *Haken* because the *Haken* court failed to address the phrase "after considering the financial resources of the parties" in section 508 and because the *Haken* decision conflicted with *Schneider*, a supreme court decision published "well after the 1996 amendment to the Act." (Emphasis omitted.) *Id.* ¶¶ 100-03. The court then recited the relevant provisions of sections 508(a) and 503(j) and determined that, based on the statutory criteria, the trial court had not abused its discretion when it found that neither party had the ability to pay the fees and denied the contribution petition. *Id.* ¶ 107.

¶ 19       The language in section 508 is clear and unambiguous. The trial court must (1) "consider[ ] the financial resources of the parties" and (2) make its decision on a petition for contribution "in accordance with subsection (j) of Section 503." 750 ILCS 5/508(a) (West 2014). To say that the court should not consider the statutory factors is clearly contrary to the plain language of the statute. Nor are we convinced, however, that *Schneider*, *Bussey*, and *Cotton* must be overturned. In *Schneider*, the court stated that "[f]inancial inability exists where requiring payment of fees would strip that party of her means of support or undermine her financial stability." 214 Ill. 2d at 174 (citing *In re Marriage of Puls*, 268 Ill. App. 3d 882, 889 (1994)). The court further noted that it considered the parties' relative earning capacities, the parties' shares of the marital assets, and the child support order before concluding that the circuit court

- 6 -

had not erred when it ordered each party to pay their own fees. *Id.* at 174-75. In *Bussey*, the court considered the respondent's net income, excluding child support payments and Social Security benefits for her children; her monthly expenses; the fact that she owned no real estate; and the fact that she was returning to college to improve her employment opportunities. 108 Ill. 2d at 300. The court compared this information to the petitioner's successful career, net income, real estate ownership, and investments. *Id.* In *Cotton*, the court considered the parties' incomes but also considered the fact that the petitioner precipitated the need for the legal fees. 103 Ill. 2d at 361. The court concluded that it would be inequitable to require the respondent to pay the fees in light of these circumstances and not just on the basis of the parties' respective incomes. *Id.* at 362. Finally, in *In re Marriage of Pagano*, the court found that the petitioner had some ability to pay her fees but that the trial court did not abuse its discretion when it found the petitioner's financial stability would be undermined if she were required to pay the total amount of her fees. 154 Ill. 2d 174, 191 (1992). The court upheld an award for 60% of the petitioner's attorney fees. *Id.* Thus, it is clear the inability to pay standard was never intended to limit awards of attorney fees to those situations in which a party could show a $0 bank balance. See *Kaufman v. Kaufman*, 22 Ill. App. 3d 1045, 1050 (1974) ("However, in this context, financial inability does not mean destitution."); *In re Marriage of Weinberg*, 125 Ill. App. 3d 904, 919 (1984) ("[I]t is not necessary for the spouse seeking the fees to divest her capital assets [citation], deplete her means of support, or undermine her economic stability [citations] in order to pay [the attorney fees]."). Rather, a party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability. This conclusion is consistent with the statutory language of section 508 and with this court's precedent.

¶ 20        A review of the record indicates that the circuit court properly considered the statutory factors to conclude that Tuke was not able to pay the entirety of her fees. As instructed by section 508, we turn to subsection 503(j) to determine whether an award of attorney fees was proper. Subsection 503(j) instructs the court to consider the criteria for dividing marital property in subsection 503(d), including:

> "(1) each party's contribution to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including *** the contribution of a spouse as a homemaker or to the family unit ***;
>
> (2) the dissipation by each party of the marital property ***;
>
> (3) the value of the property assigned to each spouse;
>
> (4) the duration of the marriage;
>
> (5) the relevant economic circumstances of each spouse when the division of property is to become effective ***;
>
> (6) any obligations and rights arising from a prior marriage of either party;
>
> (7) any prenuptial or postnuptial agreement of the parties;
>
> (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;
>
> (9) the custodial provisions for any children;
>
> (10) whether the apportionment is in lieu of or in addition to maintenance;

(11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and

(12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d) (West Supp. 2015).

Because maintenance was awarded in this case, subsection 503(j) also instructs the court to consider the criteria for an award of maintenance under section 504, including:

"(1) the income and property of each party ***;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment to the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment to the realistic present and future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party *** to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment ***;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income ***;

(11) the tax consequences of the property division upon the respective economic circumstances of the parties;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) and any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a)(1)-(14) (West Supp. 2015).

¶ 21    The circuit court found that Tuke received assets valued at $4,785,000 and debt in the sum of $636,847 at the time of the divorce. At the time of the trial on the petition to modify or terminate maintenance, Tuke's assets were valued at $2,354,296, including her interest in her home. The depletion of Tuke's assets was largely due to her payment of attorney fees. The circuit court also found that Tuke had "minimal prospects in substantially increasing her retirement account" and that she had minimal capacity for employment. Though the circuit court did not expressly rely on these factors, the record also makes clear that Tuke enjoyed a lavish standard of living during the marriage, she had forgone her career to raise the couple's children during the marriage, and because of changes to the industry, she was unlikely to be able to resume her career as a law librarian. The parties stipulated that $345,000 would be considered reasonable attorney fees for the litigation related to the petition to modify the maintenance payment. In her initial petition, Tuke stated that her attorney fees at that point exceeded $1 million. She requested another $100,000 in her petition for prospective fees. The circuit court, in each instance, found that if Tuke were required to pay the entirety of her fees,

her retirement account, which the court determined could probably not be increased, would be threatened. These findings are well established in the record and support the conclusion that Tuke's financial stability would be undermined if she were required to pay the entirety of her attorney fees.

¶ 22 The circuit court also found that Heroy received marital assets valued at $3,915,000 and debt in the sum of $778,368 at the time of the divorce. At the time of the trial on the petition to modify or terminate maintenance, Heroy's assets were valued at almost $5 million, in addition to his nonmarital interest in his family's business, the real estate held by that business, and his nonmarital fine art collection. Heroy also had an investment account valued at $932,175. Heroy's retirement account was valued at $1,435,470 and was expected to increase. These findings are also well established in the record and support the conclusion that Heroy has the ability to pay at least some of Tuke's attorney fees. Thus, the circuit court did not abuse its discretion when it ordered Heroy to pay a total of $160,000[1] of Tuke's attorney fees.

¶ 23 *Modification of Maintenance Award*

¶ 24 In support of his petition to modify or terminate the maintenance award, Heroy presented evidence that his income had significantly decreased since the 2006 dissolution order was entered. Based on this change of circumstances, the circuit court reduced the monthly maintenance payment from $35,000 per month to $27,500 per month. "[T]he propriety of a maintenance award" and the decision to modify such an award are "within the discretion of the trial court and the court's decision will not be disturbed absent an abuse of discretion." *Schneider*, 214 Ill. 2d at 173; *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). An abuse of discretion occurs when " 'the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Blum*, 235 Ill. 2d at 36 (quoting *People v. Hall*, 195 Ill. 2d 1, 20 (2000)). Furthermore, this court may affirm the judgment of the circuit court on any basis contained in the record. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16.

¶ 25 Subsection 510(a-5) of the Act provides that "[a]n order for maintenance may be modified or terminated only upon a showing of a substantial change in circumstances." 750 ILCS 5/510(a-5) (West 2014). That section then provides a list of factors for the court to consider in maintenance modification proceedings, including the factors set forth in subsection 504(a). *Id.* Both parties presented extensive evidence regarding Heroy's income, and Tuke conceded that Heroy's income had decreased. Although the experts disagreed about the extent of the income reduction, the circuit court found that, even according to Tuke's expert's calculations, Heroy's cash flow declined significantly between 2006 and 2009. This finding is well supported by the record and is not challenged by Tuke in her appeal.

¶ 26 Based on this change in circumstances, the circuit court decreased Heroy's monthly maintenance payment from $35,000 per month to $27,500 per month. On appeal, Heroy argued that the circuit court made a calculation error and thus that the maintenance award should be reduced further. In its opinion upon denial of Heroy's motion for reconsideration, the circuit court noted it was "approximat[ing] an award of about 25% of David's cash flow."

---

[1]Of this amount, $125,000 was awarded based on the initial petition, and $35,000 was awarded as prospective fees based on the second petition.

Unlike the appellate court, we are not convinced, based on our reading of the entirety of the opinion, that this statement indicates the circuit court intended to award exactly 25% of Heroy's cash flow as maintenance. Throughout the opinion the court addressed the various factors used for determining maintenance payments under section 510. It reviewed Tuke's employment efforts, her expenses, the amount she would be required to pay retroactively, and the tax implications for both parties. The only mention of the maintenance amount relative to cash flow appears in the concluding paragraph in response to Heroy's statement that the award was 33% of his income. Furthermore, the use of the terms "approximates" and "about" indicates that the court did not intend to set the award at exactly 25% of cash flow. Thus, we conclude the circuit court did not make a calculation error, and for that reason, we do not need to address what remedy is proper when a reviewing court determines that a calculation error occurred.

¶ 27   Heroy further contends, in his request for cross-relief, that the circuit court's maintenance decision should be vacated because the court failed to properly consider Tuke's insufficient efforts to secure adequate employment. Section 510 includes among the factors to be considered when reviewing a petition to modify maintenance, "the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate." 750 ILCS 5/510(a-5)(2) (West 2016). Tuke contends that this factor should not be considered in permanent maintenance cases because the court has already concluded that the recipient cannot become entirely self-supporting and therefore the issue is *res judicata*. In this case, the circuit court noted that the original dissolution order included a finding that Tuke could not expect, based on her skills and experience, to make enough money to support herself in the standard of living to which she had become accustomed. Heroy insists that all maintenance recipients have a duty to try to become self-supporting and that *res judicata* cannot bar the court from considering Tuke's actions after the dissolution judgment was entered.

¶ 28   We need not address the duty, if any, of permanent maintenance recipients to seek to become self-supporting because the circuit court in this case reviewed Tuke's efforts and found them to be sufficient. The record indicates that she investigated selling her business, that she made an inquiry with a hiring agency regarding librarian positions and was told that she was not qualified, and that she received training to work as tax preparer. While these efforts may be minimal, the circuit court did not abuse its discretion in concluding that the efforts were reasonable in light of the circumstances. Furthermore, the self-support factor is just one of several factors that the circuit court considers when deciding whether to modify a maintenance award, and the court already considered Tuke's ability to earn $40,000 to $50,000 when calculating the maintenance amount. Because the circuit court thoroughly examined each of the applicable statutory factors for modifying a maintenance award, because there is no evidence that the circuit court made a calculation error, and because the reduction in maintenance to $27,500 per month is well supported by the record, we conclude that the circuit court's judgment was not an abuse of discretion.

¶ 29                                    CONCLUSION

¶ 30   Several panels of our appellate court have addressed the perceived tension between this court's holding in *Schneider* and section 508 of the Illinois Marriage and Dissolution of

Marriage Act. *Schneider* states that a party seeking contribution must establish that he or she is unable to pay his or her attorney fees and that the other party is able to do so. Section 508 directs the court to consider a number of factors when deciding whether and in what proportion to award attorney fees. We find these two requirements complement, rather than contradict, each other. The statutory factors are the tools used by the court to decide whether a party is unable to pay and whether the other party is able to do so. The circuit court properly considered these factors, and the record supports the findings that Donna Tuke's financial stability would be undermined if she were required to pay all of her attorney fees and that David Heroy has the ability to pay the fees. Thus, the circuit court did not abuse its discretion when it ordered Heroy to pay a total of $160,000 toward Tuke's fees.

¶ 31 The circuit court's judgment regarding Heroy's petition to modify the maintenance award is also affirmed. The court carefully considered the factors set forth in section 510(a-5), including Tuke's efforts at supporting herself. Furthermore, there is no reason to conclude the circuit court made a calculation error. The modified maintenance award was based on consideration of a number of factors, not a strict percentage of Heroy's cash flow. Regardless, the circuit court judgment is supported by the record, and thus we conclude the circuit court did not abuse its discretion when it reduced the maintenance payment to $27,500 per month.

¶ 32 The judgment of the appellate court is reversed in part, the judgment of the circuit court is affirmed, and this cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 33 Appellate court judgment affirmed in part, reversed in part.

¶ 34 Circuit court judgment affirmed.

¶ 35 Cause remanded.